**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARY BURKE, | : |
| | : |
| Plaintiff, | : |
| | : Civil Action No. 17-1751 (FLW) |
| v. | : |
| | : **OPINION** |
| NANCY A. BERRYHILL, | : |
| Acting Commissioner of Social Security, | : |
| | : |
| Defendant. | : |
| | : |
| | : |

**WOLFSON, United States District Judge:**

Mary Burke ("Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Nancy A. Berryhill ("Defendant"), denying Plaintiff disability benefits under Title XVI of the Social Security Act (the "Act"). After reviewing the Administrative Record ("A.R."), the Court finds that the Administrative Law Judge's ("ALJ") determination of the residual functional capacity ("RFC") was not based on substantial evidence, because the A.R. does not substantially support that Plaintiff retains the physical capacity to perform medium work. Accordingly, remand is warranted.

I.     **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff was born on October 11, 1959 and was 53 years old on the alleged disability onset date of January 25, 2013. A.R. 79. Plaintiff graduated from high school and completed 4 or more years of college; however, based on the record, Plaintiff does not appear to hold a college degree. A.R. 210. Prior to her alleged disability, Plaintiff worked as a systems analyst and assembler of electric accessories. A.R. 210.

On March 18, 2013, Plaintiff applied for supplemental security income, alleging disability beginning on January 25, 2013. A.R. 174-82. Plaintiff's claims were denied on June 14, 2013, A.R. 93-97, and again upon reconsideration on August 27, 2013. A.R. 101-105. Thereafter, Plaintiff requested a hearing, which was held by video conference on February 26, 2015, before ALJ Dennis Katz. A.R. 40, 42. The ALJ determined that Plaintiff was not disabled and denied her claims for supplemental security income. A.R. 34. Plaintiff requested review by the Appeals Council, which was denied on January 11, 2017. A.R. 1-4. On March 16, 2017, Plaintiff filed the instant appeal.

**A.      Review of the Medical Evidence**

On March 9, 2013, Plaintiff admitted herself to the Emergency Department at Barnabas Hospital with complaints of depression and suicidal ideation without a plan or intent. A.R. 310. Plaintiff was described as a "poor historian" because of "acute intoxication"; however, during an examination, she indicated that she suffers from alcoholism, bipolar disorder, anemia, regularly uses tobacco, but refrained from any intravenous drug use. A.R. 310-311, 315. Plaintiff stated that her bipolar disorder caused her to experience "fluctuating suicidal ideation for many years," which symptom was exacerbated by alcohol use. A.R. 317. However, Plaintiff never acted or intended to act on her suicidal thoughts, which her adult son and significant other, with whom she lived, corroborated. A.R. 317, 319. Despite Plaintiff's suicidal ideation, they stated that she "never made any suicide attempt in the past," and her son "never [saw] any sign or indication that she would act" on such thoughts. A.R. 317.

Plaintiff also reported various "stressors" during the examination, including: unemployment, financial strain, the recent death of her brother-in-law, and Hurricane Sandy's severe impact on her family. A.R. 317. Plaintiff stated that she had been unemployed for the past

seven years and worries excessively; however, her son and significant other provide support and she sells her art as a freelancer. A.R. 317, 319. Although a mental status evaluation revealed that Plaintiff's appearance was disheveled and her sleep quality was poor; her behavior was appropriate and cooperative; her speech was normal in tone and rhythm; her thought process was logical and coherent; her mood was euthymic; her memory, knowledge, and orientation were adequate and oriented in all three spheres; her impulse control was normal; her reasoning, judgment, insight, and perception were all fair; and she did not suffer from any delusional thoughts or hallucinations. A.R. 320. The examining physician determined that Plaintiff did not present a danger to herself or others, and that she would benefit from mental health treatment. A.R. 319. Plaintiff agreed to obtain such treatment at Ocean Mental Health. A.R. 319.

On April 21, 2013, Thomas Plahovinsak, Ph.D., performed a consultative psychological evaluation on Plaintiff, during which Plaintiff was interviewed on matters in relation to her childhood, education, employment, health, and history of alcohol abuse. A.R. 331. Dr. Plahovinsak subsequently performed an assessment of Plaintiff's activities of daily living ("ADL"):

> Ms. Burke is capable of performing all ADL skills independently and maintains a good regimen of doing them. She does not have any physical problems that limit her ability to stand, lift, walk, or bend. Household chores are shared with her boyfriend; she also prefers to have his company when going to the supermarket because crowds cause her to become anxious. Ms. Burke is not in possession of a driver's license because she allowed it to expire and is now fearful to go to motor vehicle to have it renewed. Recreation time is spent engaged in artwork or playing the guitar either alone or with several friends.

A.R. 332. Dr. Plahovinsak continued the examination by performing an assessment of Plaintiff's mental status, noting:

> Ms. Burke is a 53-year-old, twice divorced, Caucasian female, who was driven to the evaluation by her boyfriend and arrived punctually for it. She presented as anxious and tense, with bouts of coughing occurring that she attributed to

allergies; the level of anxiety and coughing decreased as the interview progressed. Overall, she was cooperative and enabled rapport to be established. Ms. Burke appeared her stated age, was attired in clean, casual clothing, and displayed satisfactory grooming and hygiene; a strong smell of cigarettes emanated from her. Ms. Burke was able to sit throughout the evaluation without displaying any fidgeting or odd mannerisms, rose from the chair unassisted, and displayed a steady gait. She was verbal and served as a credible historian.

A.R. 332-33. Dr. Plahovinsak also made the following observations: Plaintiff was oriented in all three spheres; she had a clear sensorium; her speech was lucid and goal directed; her thought processes were clear and coherent; she did not show signs of a formal thought disorder; and she denied hallucinations, delusions, and flashbacks, nor were they suspected. However, Plaintiff experienced racing thoughts that were intensified by her pattern of worrying, and Plaintiff's speech was over productive and pressured. A.R. 333. Dr. Plahovinsak further observed:

> She acknowledged that she prefers predictability and is a self-proclaimed 'control freak.' She tends to anticipate worse case scenarios, which increases her level of anxiety. Crowds also cause her to become anxious because she does not like to have people touching her or invading her space. A history of compulsions/rituals was denied. Ms. Burke has historically had mild to moderate problems managing money.

> Ms. Burke displayed a tearful and tense affect that was congruent to her mood, which was anxious and depressed. She tends to become quickly and easily irritated, which includes being impatient with herself. Anger results in bouts of 'going off.' Ms. Burke sleeps in blocks of 3-4 hours, but has a history of insomnia in which she has been awake for 72 hours consecutively. Her energy is currently low while her appetite and libido are fair. She weighs 125 pounds while standing 5'3''; she weighed 111 pounds last year.

A.R. 333. Towards the end of the examination, Dr. Plahovinsak assessed Ms. Burke's level of cognitive functioning, determining that it falls within "the average range." A.R. 333. Dr. Plahovinsak ultimately diagnosed Plaintiff with generalized anxiety disorder, bipolar disorder, and ruled out personality disorder not otherwise specified. A.R. 333. In his concluding remarks, Dr. Plahovinsak attested to the following: "[t]he prognosis for Ms. Burke is favorable with treatment. She would be able to follow directions at a complex level of difficulty and would

demonstrate moderate-significant problems interacting with others. She would be able to manage her own funds if money were awarded." A.R. 333. Plaintiff was ultimately assessed a GAF[1] score of 60.

On May 28, 2013, Alexander Hoffman, M.D., a state agency medical consultant, conducted a physical examination on Plaintiff. A.R. 334-336. Dr. Hoffman described Plaintiff as a "thin [and] slightly hyper individual" who is cooperative, good-natured, and capable of both following directions and responding to questions in a lucid manner. A.R. 335. During the examination, Plaintiff walked normally without a cane and was capable of getting on and off the medical table without requiring assistance. A.R. 335. Plaintiff's skin appeared clear, with the exception of a raised, discolored lesion on her left shoulder. A.R. 355. Dr. Hoffman attested to the following:

> Her head is normocephalic. Her pupils are equally reactive. The extraocular movements full. Sclerea, cornea, and conjunctivae were clear. Anterior chambers and fundi look normal. Tympanic membranes clear. Pharynx clear. Dentition, very poor with a lot of rotted teeth. The neck is supple. There are no bruits. Chest is clear to percussion and auscultation. No audible wheezes, rales, or rhonci. Examination of the heart, regular rate and rhythm. Normal S1, S2. No murmur. No friction rub. Abdomen is soft. Bowel sounds present. No masses. No organomegaly. No CVA tenderness. Lower extremities, no edema. No trophic change. Intact pulses. Normal dorsiflexion and plantar flexion of the toes. Straight leg raising goes to at least 65-70 degrees bilaterally. Flexion at the knee is full. No swelling. No crepitus. She is right-hand dominant.

A.R. 335. Plaintiff had excellent grip, biceps, and triceps strength, and displayed a full range of motion at the wrist, elbow, and shoulder. A.R. 335. Plaintiff was capable of bearing weight on both legs and performing a complete deep knee bend, flexing fully at the waist, and walking on

---

[1]     GAF is an acronym referring to an individual's score on the Global Assessment of Functioning Scale. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed.  Text Revision 2000). The scale is a tool which reflects the "clinician's judgment of [an] individual's overall level of functioning" in light of his impairments in psychological, social, and occupational functioning. *Id.* A GAF of 55-60 is indicative of a moderate impairment in social or occupational functioning. *Id.* at 34.

her heels and toes. A.R. 335. Dr. Hoffman also administered an EKG, yielding borderline results. A.R. 335.

On June 13, 2013, George Bousvaros M.D., a state agency medical doctor, independently reviewed Plaintiff's medical records, and rendered an opinion as to Plaintiff's exertional efforts. A.R. 73-74. In doing so, he determined that Plaintiff was capable of performing a light range of work, including: occasionally lifting and/or carrying up to 20 pounds, frequently lifting and/or carrying up to 10 pounds, standing and/or walking (with normal breaks) for a total of approximately 6 hours in an 8-hour work day, sitting (with normal breaks) for a total of approximately 6 hours in an 8-hour workday, and pushing and/or pulling objects without limitation. A.R. 73-74. Plaintiff did not have any postural, manipulative, visual, communicative, environmental, understanding, or memory limitations. A.R. 74.

On August 26, 2013, Brady Dalton, Psy.D., a state agency psychologist, independently reviewed Plaintiff's medical records and rendered an opinion as to Plaintiff's ability to perform sustained work activities over the course of a normal workday/week. A.R. 84-91. In doing so, Dr. Dalton adopted the prior medical findings, such as Plaintiff was confined to the performance of light work, *i.e.*, lifting and/or carrying up to 20 pounds and frequently lifting and/or carrying up to 10 pounds. Specifically, Dr. Dalton concluded that Plaintiff was not significantly limited in her capacity to perform the following tasks: carry out very short and simple instructions; carry out detailed instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; recognize normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic

goals or make plans independently of others. A.R. 89. On the other hand, Dr. Dalton concluded that Plaintiff was moderately limited in her capacity to perform the following tasks: maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance, and being punctual within customary tolerance; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. A.R. 87-89. Dr. Dalton concluded his assessment by indicating that Plaintiff, "[a]lthough anxious and depressed, . . . retains the ability to understand, remember, and execute instructions. She can adapt to change and adjust to supervision in environments where the emotional demands are modest." A.R. 89.

On November 18, 2013, during a routine checkup, Plaintiff's mental health provider sent her to the emergency room for elevated blood pressure. A.R. 367, 369. Plaintiff had no complaints, was not in any distress, and denied all of the following symptoms: chest pain, headache, dizziness, abdominal pain, nausea, vomiting, shortness of breath, and palpitations, dysuria, muscle pain, or weakness. A.R. 369. Her condition improved on that same day and Plaintiff was discharged. A.R. 371.

On November 20, 2013, Plaintiff underwent an intake assessment at Ocean Mental Health, during which Plaintiff exhibited "tangential speech," "racing thoughts," and a "somewhat elevated mood." A.R. 391. Plaintiff described difficulty sleeping, indicated that she "sometimes forgets to eat," and presented the following changes in her health status: "itching, pain [in her] right shoulder[,] and a teeth/gum problem." A.R. 391. Plaintiff stated that she was active in "AA

and would like to continue to be open to attending more social events and be active in her community," and that she was "taking care of her son who has William's Syndrome . . . ." A.R. 391. A mental status examination demonstrated that Plaintiff was alert and oriented to person, place and time; appropriately dressed and presented with good hygiene; cooperative; maintained good eye contact; well developed; well nourished; ambulatory and in no acute stress; denied auditory or visual hallucinations, paranoia or delusions; denied any suicidal or homicidal ideation or plan; and had intact insight. A.R. 391-392. However, Plaintiff displayed some short-term memory difficulty and poor judgment. A.R. 391-392. As treatment, the examiner recommended a five day a week partial care day program, as well as a psychiatric evaluation and medication monitoring. A.R. 392.

On January 10, 2014, Krystin Prasad, APN, performed a psychiatric evaluation on Plaintiff. A.R. 396. As provided in the medical notes, Plaintiff was 87 days sober at that time, and, although she felt "off balance," she stated that "the cob webs are gone[.]" A.R. 396. Plaintiff recognized the she developed a drinking problem at the age of 26, and that she was "killing herself" as a result, but denied any current suicidal or homicidal ideation. A.R. 396. Plaintiff was living with her significant other, who she described as bipolar, as well as her permanently disabled, 29-year-old son, both of whom were unable to care for themselves. A.R. 396. Indeed, Plaintiff indicated that "she can't trust them to turn on the stove" and stated that she maintained the house, grocery shopped, and cooked, but did not drive. A.R. 396. During the examination, Ms. Prasad performed a mental status evaluation revealing that Plaintiff was orientated in person, place, and time; maintained good eye contact; her short and long term memory were intact; she was focused on the need to remain sober; she denied urges to cut herself or drink; her mood was euthymic; her affect was full; her cognitive functioning, knowledge, judgment, and insight were

intact; her speech was intact, although hyperverbal and pressured; she appeared forthcoming and friendly; and she denied auditory and visual hallucinations. A.R. 397-398. The medical report also included a risk profile, demonstrating that Plaintiff was not currently homicidal, suicidal, assaultive, nor abusing any substances. A.R. 398. For treatment, Ms. Prasad recommended that Plaintiff continue with her recovery program and use Remeron, to which Plaintiff agreed. A.R. 399. Ms. Prasad assessed a GAF score of 50. A.R. 399.

On January 27, 2014, Plaintiff was admitted to the emergency room with complaints of pain on the right side of her body, emanating from her shoulder down to her hip, difficulty breathing, and weakness in her legs. A.R. 364. A physical examination revealed that Plaintiff was alert and in mild distress, but did not look ill; had a normal range of motion in her right shoulder, with no swelling; her joints, pulses, speech, and gait were normal; her cranial nerves were intact; and her strength was symmetric. A.R. 364. Plaintiff underwent a chest x-ray and right shoulder x-ray which were both normal. A.R. 365. Prior to being discharged, Plaintiff was diagnosed with acute bronchitis and chronic right shoulder pain, and prescribed ibuprofen, antibiotics, and a cough syrup. A.R. 365-66.

On April 8, 2014, Plaintiff scheduled an appointment with Bernard Wayman, M.D, seeking a referral to an orthopedic doctor for right shoulder and joint pain. A.R. 377. Plaintiff stated that the was experiencing these symptoms for five months and described their severity as a seven. A.R. 377. Plaintiff's "constant, localized, sharp, and dull" joint pain worsened with activity and weight bearing, and improved with rest and acetaminophen. A.R. 377. A general physical examination revealed that Plaintiff's right anterior shoulder exhibited tenderness and a reduced range of motion, although Plaintiff denied any cardiovascular, respiratory, gastrointestinal, and psychological symptoms, including chest discomfort, racing/skipping

heartbeat, leg pain on walking, insomnia, anxiety, and thoughts of suicide. A.R. 378. Additionally, Plaintiff's head, eyes, ears, nose, mouth, neck, lungs, heart, pulses, extremities, attention span, and concentration were normal. A.R. 378-79. Dr. Wayman ultimately diagnosed Plaintiff with a right shoulder strain, depression, and a tobacco dependency. A.R. 380-81. Dr. Wayman prescribed Tylenol Arthritis Pain and Remeron, encouraged Plaintiff to stop smoking, and referred her to an orthopedist. A.R. 381. Plaintiff was scheduled for a follow-up appointment in three months' time.

On July 28, 2014, during her follow up appointment, Plaintiff indicated that she felt well and was applying Voltaren gel, which "work[ed] for her shoulder [osteoarthritis]." A.R. 372. Although Plaintiff expressed dissatisfaction with her living and working situations, she denied insomnia, depression, anxiety, and thoughts of suicide, as well as cardiovascular, respiratory, and gastrointestinal symptoms. A.R. 373. Dr. Wayman determined that Plaintiff's tobacco dependency was "unchanged," but her depression and alcoholism "improved," as she reported being seven months sober, was seeking counseling five days a week, and denied "feeling down" and a sense of "hopelessness." A.R. 372, 374-75. Dr. Wayman encouraged Plaintiff to stop smoking, lose weight, and exercise regularly. A.R. 375.

On August 2, 2014, Plaintiff was admitted to the hospital after experiencing chest pain. Plaintiff's EKG revealed an "acute inferior myocardial infarction with ST reciprocal ST-depression" and she was subsequently brought to the catherization lab, where Dr. Sanjiv Sobti, M.D., performed a cardiac catheterization procedure with stent placement. A.R. 347, 351-52. A cardiac catheterization study showed multivessel coronary artery disease. A.R. 355. Following the procedure, Plaintiff was admitted to the hospital, where she "did well" and "gradually ambulated." A.R. 352. Plaintiff was discharged ten days later, instructed to stop smoking, and

prescribed various medications, including Metoprolol, Vistaril, Remeron, Ecotrin, Effient, and Lipitor. A.R. 363. Dr. Sobti scheduled a follow-appointment approximately one week later, during which a physical exam revealed: Plaintiff's breathing sounds were clear; her cardiac rhythms were regular; her heart sounds were normal; and she did not have murmurs. A.R. 349. Dr. Sobti determined that Plaintiff's "condition was stable," and he recommended that she continue her medications. A.R. 349-50.

On August 27, 2014, Renuka Tank, M.D., a psychiatrist at Ocean Mental Health, completed an examination report form on Plaintiff's behalf. A.R. 394. Dr. Tank indicated that Plaintiff had a history of alcohol abuse, developed a dependency on alcohol, was bipolar, was ambulatory, was unable to work for a twelve-month period, and was a likely candidate for Supplemental Security Income. A.R. 394-95.

### B.    Review of Disability Determinations

On March 18, 2013, Plaintiff applied for social security disability benefits, alleging disability beginning on January 25, 2013. A.R. 174-82. On June 14, 2013, the Social Security Administration denied Plaintiff's claim for disability benefits. A.R. 93-97. The Social Security Administration noted the following factors in reaching its decision:

> *Your condition has not affected your ability to understand, remember, cooperate with others and perform normal daily activities.
>
> *You have occasional episodes of bipolar disorder and PTSD. However, there is no permanent mental disorder which would prevent you from doing normal daily activities.
>
> *You have difficulty performing certain tasks. However, you should be able to take care of your personnel needs, understand and follow routine instructions and perform routine jobs.
>
> *You suffer from a blood condition. However, lab tests show that you are able to work.

*We realize your condition prevents you from doing your usual work; however, it does not prevent you from doing other types of work requiring less physical and mental effort

*Although you are not able to do any of the work you have done during the past 15 years, there are other kinds of work you should be able to do.

A.R. 93-94.

On August 27, 2013, the Social Security Administration denied Plaintiff's request for reconsideration. A.R. 101-05. The Social Security Administration found that the previous determination denying Plaintiff's claim was proper under the law:

*We have determined that your condition is not severe enough to keep you from working. We considered the medical and other information, your age, education, training, and work experience in determining how your condition affects your ability to work.

*The medical evidence shows we realize that you cannot do your past work, but your condition does not preclude you from all work activities.

A.R. 101-02.

C.     **Review of the Testimonial Record**

1.     **Plaintiff's Testimony**

Plaintiff appeared and testified at a hearing, held by video conference, on February 26, 2015, before the ALJ. A.R. 40-66.

Plaintiff testified that she had not worked since January 25, 2013, and that she is prevented from doing so because she is bipolar with post-traumatic stress disorder ("PTSD"), and suffered from a heart attack last August. A.R. 43. Plaintiff stated that she has been in a program at Ocean Mental Health since December, 2013, for her alcoholism, bipolar disorder, and g. A.R. 43. Plaintiff explained that the program is designed to assist in the recovery of addictions and cognitive disabilities, and Dr. Tank works as the psychiatrist and supervises the "mental illness medication." A.R. 44.

Plaintiff testified that she had a separate doctor, Dr. Sobti, who is her cardiologist. Plaintiff stated that Dr. Sobti supervises her heart medication, and that he placed two stents in her heart, following her myocardial infarction in August. A.R. 44. When asked how she had been feeling since that procedure, Plaintiff explained: "I have to take 325 milligrams of aspirin every day and it causes me complications . . . hemorrhaging through a monthly cycle. It puts me in bed for three or four days at a time . . . I'm following it up with a gynecologist it's that bad." A.R. 45. Plaintiff clarified that this symptom was caused by the aspirin, as opposed to her coronary event, and that "it also increases [her] anxiety and it puts [her], the depression gets, is even worse." A.R. 46. Plaintiff explained that she has had "dramatically" less "good days" since her "heart attack," and that she experiences shortness of breath. A.R. 46. When asked if the shortness of breath was a symptom of her heart procedure, Plaintiff stated that her cardiologist believed that her heart "is operating fine but . . . I haven't felt—I was feeling a lot better during the summer before this [myocardial infarction] happened." A.R. 46.

Plaintiff testified that she is anxious about her heart condition, and that she worries about additional coronary complications. A.R. 47. Plaintiff explained that she has suffered from anxiety attacks since she was 30 years old, and described that they cause the following symptoms: "I get lightheaded, my skin burns for no reason at all . . . [the] anxiety attack is generalized towards the center of [my] rib cage in the front." A.R. 47-48.

When asked about the status of her alcohol dependence, Plaintiff answered "my sober date is October 17, 2013. I have not back-slid or what you'd call remission," and that, whenever she thinks about drinking, she "call[s] somebody[.]" A.R. 48-49. Plaintiff testified that "she get[s] along with the people at Ocean Mental Health" because she can relate to their problems. A.R. 49. Plaintiff further testified that she will always be an alcoholic, but "with the right support

and working [her] program[,] that just for today[,] I don't have to drink . . . ." A.R. 49. Plaintiff explained that, although she does not have any friends, because she "can't be around" her old friends who drink, she gets along with people socially. A.R. 49. Plaintiff stated that she has yet to make any new "sober friends," because she spends "all" of her time at Ocean Mental Health. A.R. 49.

Plaintiff testified that she still attends, and that Ocean Mental Health provides transportation to and from her "group meetings." A.R. 56-57. Plaintiff stated that she cannot operate a vehicle because she developed an unreasonable fear of driving in 2000 and that although she lives with a roommate, she does not require his assistance to travel. A.R. 58. Plaintiff explained that she lives near a grocery store and LogistiCare provides her with transportation to the doctor. A.R. 58. Plaintiff further explained that, while it makes her "real anxious," she can ride the public bus which travels along "Route 9." A.R. 58. Plaintiff indicated that the bus makes her nervous because of "all the people there," and that while she is on it, "really weird ideas . . . start racing in [her] head" like "[a]m I going to get to where I'm going or am I going to miss my stop?" A.R. 58.

Plaintiff explained that she lives with a roommate and her 30-year-old, "mentally challenged" son who has Williams syndrome. A.R. 50. Plaintiff further explained that her son was born with a "congenital heart defect and he just had open-heart surgery in January." A.R. 50. When asked about the type of medical attention she provides for her son, Plaintiff responded: "[h]e has a medical caseworker. . . we have LogistiCare that takes him to his medical appointments. I schedule some of his doctor appointments . . . and I also make sure he manages his money well, you know, and that he has food . . . ." A.R. 50.

When asked about her prior work experience as a systems analyst, Plaintiff stated, "well, I went to college and I'm a computer analysist. I worked traveling as a consultant for 15 years, fixing major corporations' financial systems." A.R. 51. Plaintiff also stated that she previously worked as an "assembly-line person," at a company which assembled parts for plugs and extensions cords." A.R. 51. Plaintiff explained that she enjoyed working with her hands and that her work duties included: operating machines; teaching coworkers to operate machines; managing "one of the floors"; and "interpreting for some of the people [who] did not speak English." A.R. 51-52. Plaintiff further explained that she would sometimes assemble products while sitting on a bench, she could speak "some Spanish," and knew how to use sign language. A.R. 52.

Plaintiff indicated that she no longer worked as an assembly-line person, and she provided the following explanation: "I wasn't taking my medication . . . and I threatened [to hurt someone] . . . they were a constant irritation to me for a year and a half . . . . I was at the end of my rope. I couldn't take it anymore. So they just told me go home." A.R. 52. When asked if she could return to that line of work, Plaintiff mentioned: I don't think I can, your honor . . . I don't have enough good days to be able to do that job . . . I don't have enough days that, you know, I feel comfortable in my skin to go and do something like that. It was real high volume, high pressured." A.R. 53. Plaintiff explained that she could previously handle the pressure because she was "manic," but now has "a lot more depression" in her life. A.R. 53.

### 2.    Examination of Plaintiff by Plaintiff's Attorney

In response to her attorney's questions, Plaintiff stated that she averages one to two panic attacks per week. A.R. 53. Plaintiff explained that her panic attacks are triggered by "crowded area[s] like a store," "new places" or "environment[s]," "an argument at home," "[g]oing through

a situation like [her] son's surgery," and receiving "mail . . . if it's something late." A.R. 54. Plaintiff also mentioned that "[i]t takes a lot of courage . . . to go into a new doctor's office[.]" A.R. 54.

Plaintiff explained that, when she feels depressed, she "stay[s] in bed," refrains from showering, and does not "feel like eating." A.R. 54. Plaintiff further explained that her depression causes her mind to race, and prevents her from "mov[ing] too much." A.R. 54. When asked about her mood swings, Plaintiff stated: "[m]y mood swings happen, like, during the day. If it's a quiet day I'll go, I'll cycle about maybe three or four times. If it's a very stressful day it'll cycle 10 to 20 times where I go from, where I'm okay to where I feel like I'm not okay . . . ." A.R. 54-55.

When asked about her household activities, Plaintiff testified that she does not regularly cook, but "buy[s] food" and prepares meals "maybe two to three times a week for dinner. . . ." A.R. 55. Plaintiff further testified that her central heating is broken, so "it's kind of too cold to be in the kitchen[,] but I make sure that there's food in the refrigerator[,] but I don't really, I don't do too much of anything but keep my room up and I keep things picked up but I don't do anything too heavy. I'm not supposed to be picking up anything real heavy anyway, so I don't do too much." A.R. 55.

Plaintiff stated that she takes Remeron and Desyrel, which are supposed to help her sleep, although she only remains asleep for "maybe four to five hours a night," and sometimes naps in the afternoon for an hour. A.R. 55. Plaintiff explained that she "never slept very well," and that she can "stay up for days" when she is feeling manic. A.R. 55-56. When asked about whether she has difficulty walking or standing, Plaintiff responded: "I don't have too much problem. My

back hurts when I walk for long distances and sometimes it hurts. You know, I don't know if it's old age or if it, when I get up, if I sit too long my back bothers me." A.R. 56.

### 3.     Testimony of the Vocational Expert

Connie Standhart testified as a Vocational Expert ("VE") at the hearing held on February 26, 2015, before the ALJ. A.R. 59-66. The VE testified that Plaintiff's former job as a systems analyst is a "sedentary occupation," associated with DOT # 030.167-014. A.R. 61. The VE further testified that Plaintiff's former job in electrical assembly is "a light exertional occupation," associated with DOT # 729.687-010. A.R. 61.

The ALJ provided the VE with two hypothetical scenarios, first positing the following question:

> Okay. So let's suppose we have a person of the claimant's age, education, work experience and let's assume that that person has no exertion problems and could only perform basic, unskilled-type of work tasks. Could that person perform the past relevant work as assembly line, electric assembler that you described under DOT 729.687-010?

A.R. 62. The VE answered the ALJ's question in the affirmative. A.R. 63. The VE also indicated that the job of an assembly line, electric assembler is available in the amount of 5,712 nationally. A.R. 63.

The ALJ's second hypothetical was:

> Okay. Now, again, let's suppose you have a person of the claimant's age, education, and work experience that is limited to unskilled work in that she can understand, remember, and carry out short, simple instructions; can perform routine, repetitive work, not complex. Are there any jobs in the national economy for such a person with no exertion limitations?

A.R. 63. The VE also answered this question in the affirmative, and provided that such an individual could work in the following positions: dining room attendant, DOT # 311.677-018; hand packager, DOT # 920.587-018; photocopy machine operator, DOT # 207.685-014. The VE

testified that these jobs, in the aggregate, are available in the amount of 127,584 nationally. A.R. 64-65.

Plaintiff's attorney also set forth one hypothetical question: "if someone were to miss work more than four days per month on a consistent basis due to psychological symptoms and treatment would there be work available with those limitations?" A.R. 65. The VE responded in the negative. A.R. 65.

### D. ALJ's Findings

The ALJ issued a written decision, following the hearing, on May 26, 2015. A.R. 24-36. The ALJ applied the standard five-step process to determine if Plaintiff had satisfied her burden of establishing disability. A.R. 25-26.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 25, 2013, the application date. A.R. 26.

Second, the ALJ found that Plaintiff had the following severe impairments: "depression, obesity, status post myocardial infarction with stent placement and anemia." A.R. 26. In addition to these severe impairments, the ALJ found that Plaintiff had the following non-severe impairment: "alcohol abuse." A.R. 26. The ALJ determined this latter impairment did not cause any functional restrictions, because Plaintiff testified that she was an alcoholic from her alleged onset date of January 2013 through October 2013, and, therefore, it "did not last the requisite 12 months." A.R. 26. Nor did the medical evidence demonstrate that Plaintiff's alcoholism contributed to her depressive symptoms during the calendar year 2013. A.R. 26. Therefore, pursuant to 20 CFR § 416.921, SSR 85-28, and SSR 96-3p, it was a non-severe impairment. A.R. 27.

Third, the ALJ found that Plaintiff does not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under

the Act that would qualify for disability benefits. A.R. 27-28. Moreover, in this step, the ALJ considered Plaintiff's medical impairments pursuant to listings 4.00, 7.00, 12.04, and 12.09. Specifically, as to Plaintiff's physical impairments, the ALJ determined that Plaintiff's cardiac impairment did not satisfy the requirements of listing 4.00, because Plaintiff was not severely limited in the ability to "independently perform activities of daily living." A.R. 27. Nor did Plaintiff's anemia satisfy the requirements of listing 7.00, because she never received "multiple blood transfusions." A.R. 27. Moreover, as to Plaintiff's mental impairments, the ALJ similarly found that they did meet the criteria of listings 12.04 and 12.09. A.R. 27. In making this determination, the ALJ examined whether the "paragraph B" criteria of these two listings were satisfied, and found that Plaintiff suffered "no mental restrictions" for activities for daily living; "mild difficulties" for social functioning; "moderate difficulties" for concentration, persistence, or pace; and that Plaintiff has experienced no repeated and extended episodes of decompensation. A.R. 27-28. Accordingly, the ALJ found that the paragraph B criteria were "not satisfied" because Plaintiff's mental impairment did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration[.]" A.R. 28. The ALJ also considered the "paragraph C" criteria of these two listings and found those criteria also unsatisfied. A.R. 28.

Fourth, the ALJ found that Plaintiff had the residual functional capacity to perform medium work as defined pursuant to 20 C.F.R § 416.967(c), further clarifying that Plaintiff was capable of the following:

> she is able to sit for a total of 8 hours and is able to stand/walk for a total of 6 hours during the course of 8-hour work day. She is able to lift/carry objects weighing a maximum of 50 pounds. Due to moderate deficits in concentration, she is limited to the performance of unskilled tasks.

A.R. 28. In reaching this RFC determination, the ALJ considered Plaintiff's statements

concerning her own limitations, relevant medical evidence concerning both her alleged physical and mental impairments, and medical source opinion evidence. A.R. 28.

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of such symptoms were not entirely credible, since they could not be corroborated by the relevant objective medical evidence. A.R. 29.

The ALJ, similarly, discredited the findings of Dr. Tank, who opined that Plaintiff was unable to work. A.R. 32. In assigning little weight to Dr. Tank's opinion, that ALJ noted that Dr. Tank's determination was not supported by his own treatment notes, which revealed normal mental status examinations and GAF scores of 50-60. A.R. 32.

The ALJ also discredited the opinion of Dr. Plahovinsak, who opined that Plaintiff was able to follow complex directions but would have moderate to significant problems interacting with others. A.R. 32. In assigning little weight to Dr. Plahovinsak's opinions, the ALJ indicated that Plaintiff's history of depression and complaints of concentration difficulties limit her to unskilled tasks. The ALJ also noted that Dr. Plahovinsak's judgment as to Plaintiff's ability to interact with others is undermined by Dr. Plahovinsak's own examination records, which described Plaintiff as cooperative and capable of establishing a rapport, and it is also inconsistent with Plaintiff's ability to socialize with others at her rehab meetings, as well as get along with her partner and son. A.R. 32.

The ALJ additionally discredited the portion of Dr. Dalton's opinion which found moderate limitations in all domains of functioning, with 1-2 episodes of decompensation as not supported by the record. The ALJ, however, assigned "some" weight to the portion of Dr. Dalton's opinion which indicated that Plaintiff is capable of performing simple work tasks.

The ALJ also considered the opinion of Dr. Hoffman, whose physical examinations of

Plaintiff were "normal," and assigned some weight to the multiple GAF scores in the record, consistently between the ranges of 50-60. A.R. 32.

Fifth, the ALJ determined that Plaintiff is capable of performing her past relevant work as an assembly/electric person, which did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity. A.R. 32. The ALJ alternatively found that, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity, "there are jobs that exist in significant numbers in the national economy that the claimant also can perform." A.R. 33. In reaching this conclusion, the ALJ relied on the testimony of a vocational expert that an individual with Plaintiff's age, education, past relevant work experience, and residual functional capacity could perform the following representative occupations: Dining Room Attendant DOT# 311.677-018; Hand Packager DOT# 920.587-018; and Photocopy Machine Operator DOT# 207.685-014, which the vocational expert testified existed in the national economy in the aggregate amount of 127,584. A.R. 33-34.

Accordingly, the ALJ concluded that "the claimant has not been under a disability, as defined in the Social Security Act, since January 25, 2013, the date the application was filed." A.R. 34.

## II.     DISCUSSION

### A.     Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding

questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. §

404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

## B. Analysis

Plaintiff makes three arguments on appeal as to why the ALJ's disability determinations were unsupported by substantial evidence, contending that the ALJ erred in each of the following: (1) formulating Plaintiff's RFC; (2) finding that Plaintiff could return to her prior work performed; and (3) concluding that Plaintiff could perform jobs existing in significant

numbers in the national economy. The Court first determines whether the medical evidence substantially supports the ALJ's determination of Plaintiff's RFC.

First, Plaintiff argues that the ALJ erred in finding that Plaintiff could perform medium work, *i.e.*, lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. Plaintiff's Brief ("Pl.'s Br."), at 20. In making this determination, Plaintiff contends that the ALJ failed to appropriately consider Plaintiff's heart condition and that the ALJ acted in violation of his duty to complete the record. *Id.* at 18, 21. That duty, Plaintiff avers, required the ALJ to order a consultative examination with a doctor in order to "evaluate the claimant's condition status-post myocardial infarction." *Id.* 21. However, because the ALJ's assessment of Plaintiff's physical capabilities was instead based on medical records which predated Plaintiff's "heart attack," Plaintiff contends that any findings in this regard cannot be supported by the record. *Id.* 21.

As the Third Circuit has promulgated, the claimant bears the burden of developing the record, "because the claimant is in a better position to provide information about his or her own medical condition." *Money v. Barnhart*, 91 Fed. Appx. 210, 215 (3d Cir. 2004) (citation omitted). "[T]he ALJ's only duty in this respect is to ensure that the claimant's complete medical history is developed on the record before finding that the claimant is not disabled." *Id.* The ALJ will conform with this obligation if "[n]othing . . . indicates that the record lack[s] enough data for the ALJ to make a well-informed decision about whether [the claimant is] disabled," particularly where the claimant is represented by counsel during the administrative proceedings. *Id.* at 216; *Turby v. Barnhart*, 54 Fed. Appx. 118, 122 (3d Cir. 2002) ("We note, however, that this duty is most acute where the claimant is unrepresented . . . and that [the claimant in this case] was in fact represented by counsel.") (citation omitted); *Wilson v. Comm'r of Soc. Sec.*, No.

15-3096, 2018 U.S. Dist. LEXIS 10574, at *30 (D.N.J. Jan. 23, 2018) ("[I]f a claimant was represented by counsel at the administrative level, the ALJ is entitled to assume that the claimant is making the strongest case possible for benefits.") (citations and quotations omitted); *Welsh v. Colvin*, No. 13-736, 2014 U.S. Dist. LEXIS 72341, at *6 (W.D. Pa. May 28, 2014) ("Usually, the issue of whether an ALJ had developed the record fully arises in situations involving a *pro se* claimant.") (citation omitted).

Here, I note at the outset that Plaintiff's counsel represented to the ALJ that "we have a complete medical record" during Plaintiff's hearing. A.R. 42. Therefore, the ALJ could have reasonably relied on the record as presented, unless its deficiencies precluded him from assessing the significance of Plaintiff's myocardial infarction. Significantly, the medical evidence was adequately developed in this regard, such that a supplemental consultative examination of Plaintiff by a doctor was not required. Indeed, as the record shows, and the ALJ explicitly found, although Plaintiff was diagnosed with a myocardial infarction requiring stent placement surgery, Plaintiff's cardiologist subsequently examined Plaintiff and determined that Plaintiff's "condition [was] stable." A.R. 30, 349-50. Crucially, the record is devoid of any medical evidence which demonstrates a notable change in Plaintiff's condition following her cardiologist's evaluation, or that she continues to seek further medical treatment as a result of her myocardial infarction. [2] In fact, Plaintiff confirmed her cardiologist's findings at the administrative hearing, approximately one year following the occurrence of her myocardial infarction, during which the ALJ expressly inquired about Plaintiff's heart condition and elicited the following response from Plaintiff: "[t]he heart, he thinks [the cardiologist], is operating fine .

---

[2]    Although not dispositive, the Court notes that, subsequent to the denial of benefits, Plaintiff has failed to provide any additional medical evidence from her cardiologist, demonstrating a change in Plaintiff's stable condition.

. . . " A.R. 46.[3] Accordingly, in light of the medical evidence and Plaintiff's own corroborating testimony, the ALJ did not err in refusing to order a consultative examination. *Webster v. Berryhill*, No. 16-2403, 2018 U.S. Dist. LEXIS 41948, at *15 (M.D. Pa. Jan. 22, 2018) ("The decision to seek medical expert testimony or order a consultative examination is a discretionary decision left to the ALJ."). Indeed, the medical record as it relates to Plaintiff's myocardial infarction is sufficient to support the ALJ's findings in connection therewith.

Although Plaintiff's contentions related to her heart condition fail to provide grounds for relief, nevertheless, the Court's inquiry does not end. Indeed, the Court must consider, and Plaintiff takes issue with, whether substantial evidence supports the ALJ's RFC determination that Plaintiff is capable of lifting or carrying up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds, *i.e.*, medium work. In this regard, Plaintiff contends, at most, she is capable of performing light work. Had the ALJ determined that Plaintiff was limited to light work and included this restriction in the hypotheticals which the ALJ posited to the VE, Plaintiff contends that she would have been entitled to an award of disability. In that connection, Plaintiff argues that two of three jobs that the VE identified would no longer be applicable here, given that they required the performance of medium work, *i.e.*, dining room attendant and hand packager. Moreover, as to the last job which the VE identified, photocopy machine operator, Plaintiff maintains that, although this position requires only light work, she would have, nevertheless, been entitled to an award of disability benefits pursuant to GRID rule 202.06. That rule provides: "a person of advanced age (55 years and older), who is a high school graduate with no transferable skills and also limited to light work is disabled." *Marshall v. Colvin*, No. 13-

---

[3]     Although Plaintiff stated that, following her myocardial infarction, she experiences "hemorrhaging through a monthly cycle[,]" the result of which "puts [her] in bed for three or four days at a time," Plaintiff clarified that this particular symptom is a result of the aspirin she was prescribed. A.R. 45-46.

241, 2015 U.S. Dist. LEXIS 38534, at *2 n.1 (W.D. Pa. Mar. 26, 2015). In this regard, it is undisputed that, if Plaintiff's RFC is limited to light, unskilled work, she would qualify for disability under GRID rule 202.06, since she is a high school graduate, and reached "advanced age" at the time of her hearing. Therefore, the determination of whether Plaintiff is capable of performing medium work or light work is significant in awarding disability benefits.

"In making a residual functional capacity determination, the ALJ must consider all evidence before him," and is additionally required to "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 121 (3d. Cir. 2000). Ultimately, "[w]here the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012).

Here, substantial evidence does not support that Plaintiff can engage in medium work. Specifically, the ALJ's findings in connection with Plaintiff's exertional capabilities were based, among other things, on various medical records which indicated that Plaintiff's "problems" were primarily psychological. A.R. 29, 30. The ALJ also relied on reports which showed "normal" physical examinations, specifically referencing physical consultative examiner Dr. Hoffman, who determined "normal physical examination findings[.]" A.R. 30, 32. However, these records cannot constitute substantial evidence for the purpose of affirming the ALJ's RFC formulation, as is required under the pertinent law. Significantly, although her physical examinations and evaluations were "normal," such records, as a whole, fail to support that Plaintiff—a 55 year-old-female who was diagnosed with a right shoulder strain and a reduced range of motion in her right shoulder—has the *physical capacity* to "lift no more than 50 pounds at a time with frequent

lifting or carrying of objects weighing up to 25 pounds." The performance of medium work presumes that the claimant is capable of meeting these demands. To the contrary, while not dispositive, state agency physician Dr. Bousvaros's residual functional capacity report demonstrates that Plaintiff is confined to the performance of "light work," not medium work, comprised of occasionally lifting and/or carrying up to 20 pounds and frequently lifting and/or carrying up to 10 pounds. Moreover, Dr. Dalton adopted these findings with respect to Plaintiff's exertional limitations. A.R. 73. To be clear, the ALJ was not bound by these determinations and may have ultimately rejected them; however, at a minimum, the ALJ was required to articulate a basis for discrediting Dr. Bousvaros's and Dr. Dalton's physical assessments.[4] *Garibay v. Comm'r of Soc. Sec.*, 336 F. App'x 152, 156 (3d Cir. 2009) ("In making an RFC determination, an ALJ must discuss both the evidence that supports his conclusion and the evidence that was rejected."). Significantly, this explanation was absent from the record. Notwithstanding this deficiency, the medical record, as a whole, lacks any medical diagnosis that tends to support the fact that Plaintiff possesses the capability to perform the demands of medium work, despite her "normal" physical evaluations. In fact, a diagnosis of normal does not speak to the level of physical exertion Plaintiff retains. Therefore, the ALJ's formulation of the RFC with respect to Plaintiff's exertional capabilities was not based on substantial evidence.

Because the ALJ's findings at step four and step five are contingent upon a properly formulated RFC, including the appropriate exertional level at which Plaintiff can perform work, the Court need not examine the remainder of Plaintiff's arguments on this Motion. Rather, remand on the basis of ascertaining Plaintiff's exertional level in light of the pertinent medical evidence is warranted. Although, on remand, the ALJ may ultimately conclude that his prior

---

[4]     The ALJ's Opinion discredited a different portion of Dr. Dalton's medical report, unrelated to Plaintiff's physical limitations.

determination of medium work is correct, this finding must be grounded in substantial evidence.

## III.    CONCLUSION

For the reasons set forth above, substantial evidence did not support the ALJ's formulation of Plaintiff's RFC. Remand on the basis of determining Plaintiff's proper exertional level is appropriate.


Dated: October 29, 2018

/s/ Freda L. Wolfson
Freda L. Wolfson
United States District Judge
